## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JOSEPH P.,

    **Plaintiff,**

**v.**

**ANDREW SAUL,** *Commissioner,*
*Social Security Administration*,

    **Defendant.**

**CIVIL ACTION FILE**

**NO. 1:20-cv-00924-AJB**

## <u>ORDER AND OPINION</u>[1]

Plaintiff Joseph P. brought this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for social security disability insurance benefits ("DIB")

---

[1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entry dated 3/30/2020 & 3/31/2020).  Therefore, this Order constitutes a final Order of the Court.

under the Social Security Act.[2]   For the reasons set forth below, the Court **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.   PROCEDURAL HISTORY

Plaintiff filed an application for DIB on or around September 12, 2016, alleging disability commencing on April 1, 2016.  [Record (hereinafter "R") 53, 90, 159-60].   Plaintiff's application was denied initially and on reconsideration.  [R53, 90].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").   [R106-07].   An evidentiary hearing was held on October 2, 2018.  [R29-52].   The ALJ issued a decision on January 7, 2019, denying Plaintiff's

---

[2]      Title II of the Social Security Act provides for federal DIB. 42 U.S.C. § 401 et seq.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq., provides for Supplemental Security Income Benefits for the disabled ("SSI").  Unlike DIB claims, SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).   Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.   *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims.

application on the ground that he had not been under a "disability" at any time through the date of the decision. [R12-28]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on January 16, 2020, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff then filed his action in this Court on February 28, 2020, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on May 28, 2020. [Docs. 11, 12]. On June 9, 2020, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 14]; on July 9, 2020, the Commissioner filed a response in support of the decision, [Doc. 17]; and on July 23, 2020, Plaintiff filed a reply brief in support of his petition for review of the Commissioner's decision, [Doc. 19]. Per Plaintiff's request, the Court heard oral argument on February 25, 2021. [Doc. 26]. The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically

3

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)-(3).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[3] *on other grounds as*

_____

[3]    Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the

*stated in Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018).  The claimant must prove at step one that he is not undertaking substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities.  20 C.F.R. § 404.1520(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work.

─────────────────

administrative process.  *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330,   338-39   (S.D.N.Y. 2001);   *Tauber   v.   Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

20 C.F.R. § 404.1520(a)(4)(iv).     At   step   five,   the   regulations   direct   the Commissioner to consider the claimant's residual functional capacity ("RFC"), age, education, and past work experience to determine whether the claimant can perform other   work   besides   past   relevant   work.     20   C.F.R.   §   404.1520(a)(4)(v).     The Commissioner must produce evidence that there is other work available in the national   economy   that   the   claimant   has   the   capacity   to   perform.     *Doughty*, 245 F.3d at 1278 n.2.   To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the     sequential     evaluation     ceases     and     further     inquiry     ends. 20 C.F.R. § 404.1520(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## III.   <u>SCOPE OF JUDICIAL REVIEW</u>

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.   Judicial review of the administrative decision

6

addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). The Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180;

*Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## IV.   <u>PLAINTIFF'S CLAIMS AND THE ALJ'S DECISION</u>

Plaintiff was fifty-three years old on the alleged onset date and fifty-five years old on the date of the ALJ's adverse decision. [R24, 159]. He has a high-school education and past relevant work as an information scientist and data entry clerk. [R47, 175-76]. Plaintiff alleges disability as of April 1, 2016, due to bipolar II disorder,[4] severe depression, anxiety, panic disorder, chronic pain

---

[4]    Bipolar II disorder "is defined by a pattern of depressive episodes shifting back and forth with hypomanic episodes, but no full-blown manic or mixed episodes." Nat'l Inst. of Mental Health, *Bipolar Disorder*, http://www.nimh.nih.gov/health/publications/bipolar-disorder/index.shtml (last visited 3/1/2021).

syndrome, lumbar degenerative disc disease with lumbosacral radiculopathy,[5] and chronic hip pain due to osteoarthritis.  [R34, 174].

At the hearing taking place before the ALJ on October 2, 2018, Plaintiff testified that he had hip and back pain that radiated to his knees and for which he was prescribed hydrocodone.[6]  [R42-43].  He stated that his medications caused sleepiness and problems with his concentration and memory:  he could not concentrate enough to finish anything and could not remember things even a few hours after they happened.  [R29, 42-43].  He admitted that he had visited Disney World a couple of times that spring for three to four days at a time for his daughter's cheerleading competitions, but he stated that he stayed in the hotel room except for her performances because he was paranoid about crowds and had difficulty sitting due to pain.  [R43-45].  He also submitted a medication list

---

[5]    "Radiculopathy" refers to a disorder of the spinal nerve roots. Radiculopathy, *PDR Med. Dictionary* (1st ed. 1995).

[6]    Hydrocodone is a narcotic analgesic medication used to relieve severe pain.                    MedlinePlus,                    *Hydrocodone*, https://medlineplus.gov/druginfo/meds/a614045.html (last visited 3/2/2021).

indicating that he was taking Seroquel XR 300 mg[7]; lamotrigine 200 mg[8]; clonazepam 0.75 mg[9]; lithium 300 mg (twice daily)[10]; alprazolam 0.5 mg[11]; hydrocodone/ACET 10/325 mg (three times per day)[12]; gabapentin 400 mg

---

[7]   Seroquel (quetiapine) is an atypical antipsychotic medication used to treat the symptoms of schizophrenia, bipolar disorder, mania, and depression. MedlinePlus, *Quetiapine*, http://medlineplus.gov/druginfo/meds/a698019.html (last visited 3/1/2021).

[8]   Lamotrigine, commonly sold under the brand name Lamictal, is an anticonvulsant medication used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. MedlinePlus, *Lamotrigine*, http://medlineplus.gov/druginfo/meds/a695007.html (last visited 3/1/2021).

[9]   Clonazepam, commonly sold under the brand name Klonopin, is a benzodiazepine medication that is used to control certain types of seizures and to relieve panic attacks. MedlinePlus, *Clonazepam*, https://medlineplus.gov/druginfo/meds/a682279.html (last visited 3/1/2021).

[10]   Lithium is in a class of medications called "antimanic agents." It is used to treat and prevent episodes of mania in patients with bipolar disorder. MedlinePlus, *Lithium*, https://medlineplus.gov/druginfo/meds/a681039.html (last visited 3/1/2021).

[11]   Alprazolam, commonly sold under the brand name Xanax, is a benzodiazepine medication typically used to treat anxiety disorders and panic disorder. MedlinePlus, *Alprazolam*, https://medlineplus.gov/druginfo/meds/a684001.html (last visited 3/1/2021).

[12]   This notation refers to a combination medication containing ten milligrams of hydrocodone and 325 milligrams of acetaminophen that is commonly sold under the brand names Lortab, Norco, and Vicodin. It is used to relieve moderate to severe pain. Kaiser Permanente, *Hydrocodone 10 mg-Acetaminophen 325 mg Tablet*, https://healthy.kaiserpermanente.org/health-wellness/drug-encyclopedia/drug.hydrocodone-10-mg-acetaminophen-325-mg-tablet.204978 (last visited 3/1/2021).

(five times per day)[13]; promethazine 25 mg (as needed for nausea); and omeprazole 20 mg.[14]  [R246].

In a letter to the ALJ, Plaintiff's wife reported that it was not easy to live with Plaintiff and his condition.  [R248].  She stated that he had significant mood swings and frequent outbursts of anger; often misinterpreted statements as being critical of him; and would obsess over small things like whether lights were on or doors were locked.  [R248].  She indicated that his conditions made it difficult for him to go out, sometimes even to familiar places.  [R248].  She also reported that he could not remember things one day to the next, that his conditions and medications for treatment made him drowsy, and that he would often go a couple of days without eating because he was so depressed or anxious.  [R248].  She also

---

[13]    Gabapentin is an anticonvulsant medication used to help relieve burning, stabbing, or shooting pain often caused by nerve damage.  Mayo Clinic, *Anti-Seizure Medications: Relief from Nerve Pain*, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/in-depth/pain-medications/ART-20045004?p=1 (last visited 3/1/2021).

[14]    Omeprazole, commonly sold under the brand name Prilosec, is used to treat gastroesophageal reflux disease ("GERD"), a condition in which backward flow of acid from the stomach causes heartburn and possible injury to the esophagus (the tube between the throat and stomach).  MedlinePlus, *Omeprazole*, https://medlineplus.gov/druginfo/meds/a693050.html (last visited 3/1/2021).

stated that when the family had visited Universal [15] for Plaintiff's daughter's cheerleading competition, Plaintiff had to take a break after less than an hour and fell asleep on a concrete bench for two hours.  [R248].

The ALJ subsequently issued the decision in which he found that Plaintiff was not "disabled" within the context of the Social Security regulations.  [R15-24]. In doing so, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2020.

2.  The claimant has not engaged in substantial gainful activity since April 1, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease, osteoarthritis, bipolar disorder/depression and anxiety/panic disorder (20 CFR 404.1520(c)).

    . . .

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

    . . .

---

[15]   It appears that Plaintiff or his wife conflated Disney World and Universal.  For simplicity's sake, the Court will follow the lead of the ALJ and refer to the trips as visits to Disney World.

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except:  The claimant is limited to no more than occasional climbing of ramps [or] stairs, stooping, kneeling, crouching, or crawling.  No more than frequent balancing.  No climbing of ladders, ropes, and scaffolds.  Able to perform simple tasks.  Able to sustain attention and concentration for two hours at a time for the performance of simple tasks.  Unable to work directly with the public.  Able to tolerate occasional, casual interaction with coworkers and supervisors.  Able to tolerate direct, casual supervision.  Able to adapt to routine changes.  Able to make simple decisions.  Would generally work better with things, rather than with people.  Unable to tolerate a fast-paced work environment.

        . . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

        . . .

7.      The claimant was  . . . 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  The claimant subsequently changed age category to advanced age (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

13

significant numbers in the national economy that the claimant
can perform (20 CFR 404.1569 and 404.1569a).

. . .

11.   The claimant has not been under a disability, as defined in the
      Social Security Act, from April 1, 2016, through the date of this
      decision (20 CFR 404.1520(g)).

[R17-24].

The ALJ explained that he gave little weight to opinions issued by W. Theron

McLarty, M.D., P.C., Plaintiff's treating psychiatrist, because Dr. McLarty's

opinion that Plaintiff was disabled was not a medical opinion but rather was an

opinion on an issue reserved to the Commissioner, [R18-19]; because the ALJ

found Plaintiff's treatment to have been "routine in nature," without any

emergency-room or inpatient mental-health treatment since the alleged onset date,

[R18]; and because Dr. McLarty's opinion that Plaintiff's functional ability was

"abnormal" was "vague and not defined in terms according to program policy,"

[R19].  The ALJ additionally explained that although he found that Plaintiff had

severe impairments that could reasonably be expected to cause his alleged

symptoms, his claims of disabling intensity, persistence, and limiting effects were

not entirely consistent with the medical evidence and other evidence of record:

Plaintiff's examinations were routine in nature and showed no medication side

effects or increase in pain symptoms, except when Plaintiff requested

14

documentation from treating pain specialist Jignesh N. Gandhi, M.D., for the purposes of remaining unemployed, and Plaintiff declined injections and physical therapy, treating his back pain only with medication, which Plaintiff reported was beneficial and allowed him to pursue activities that he found difficult to perform when in pain, such as general daily activities and household chores, the ability to sit and stand for an extended period, and the ability to make multiple trips to Disney World.  [R20-22].  The ALJ also explained that he assigned "great weight" to the opinions of the non-examining physicians because he found them to be consistent with the other evidence in the record.  [R22].  Finally, the ALJ explained that based on the hearing testimony of a vocational expert that a person of Plaintiff's age, education, and work experience with the above RFC was capable of working in such representative occupations as hand packager, cleaner, or cleaner of laboratory equipment, he found that Plaintiff was not disabled.  [R23].

## V.   CLAIMS OF ERROR

Plaintiff argues that it was error for the ALJ to assign little weight to the opinions of Plaintiff's long-time psychiatrist, Dr. McLarty, particularly in the absence of an independent psychological consultative evaluation countering the opinions.  [Doc. 14 at 1-3, 5-9].  He also contends that the ALJ erred by failing to consider the disabling side effects of psychotropic medications and narcotic pain

medications that Plaintiff had been prescribed and was using.  [Doc. 14 at 1, 9-10 (citing [R246])].  The Court agrees.

Under the regulations applicable to Plaintiff's claim for benefits, the ALJ must assign controlling weight to the opinion of a treating physician unless he supplies good cause for assigning the opinion less weight. 20 C.F.R. § 404.1527(c).[16]  "Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3) the treating physician's opinion was conclusory or inconsistent with his or her own medical records."  *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1259 (11th Cir. 2019).  Failure to clearly articulate good cause for discounting the weight of a treating opinion constitutes reversible error.  *Id.*

The ALJ did not supply good cause for discounting Dr. McLarty's opinions.  First, contrary to the ALJ's representation that Dr. McLarty rendered "vague" opinions simply describing Plaintiff's condition as "abnormal," review of the record reveals that Dr. McLarty provided two detailed medical opinions during the relevant period:  a mental-impairment questionnaire completed in January 2017,

---

[16]     Although 20 C.F.R. § 404.1527 has been superseded, it remains applicable to cases such as Plaintiff's that were filed prior to March 27, 2017. 20 C.F.R. § 404.1527 (2017).

[R395-98], and a letter dated August 12, 2018, [R566]. In the January 2017 opinion, Dr. McLarty stated that he had first seen Plaintiff on March 22, 2010, for depression, bipolar II disorder, alcohol abuse, and a history of general anxiety disorder. [R396]. He indicated that depression was Plaintiff's primary issue, with mood instability and difficulty functioning in his work and home life. [R396]. He stated that Plaintiff's current medical regimen included Lamictal at 300 mg per day; Seroquel XR at 150 mg per day; neurontin at 400 mg five times per day; lithium at 600 mg per day; and Klonopin at .5 mg at bedtime. [R396]. He also noted that a mental-status examination taking place on January 6, 2017, revealed normal orientation, appearance, general behavior, and recent and remote memory; intense, preoccupied, distant, and unstable affect and mood; indecisive and distractible thought processes and flow of mental activity; paranoid suspicions; fleeting suicidal ideation; questionable insight and judgment; and marginal impulse control. [R396-97]. Dr. McLarty also observed that Plaintiff's poor functioning was due to illness, that he had attempted to work but was unable to do so because of his illness, and that he was usually dismissed by employers due to symptoms consistent with bipolar illness. [R397]. Dr. McLarty diagnosed bipolar II disorder and opined that Plaintiff's ability to understand, remember, and carry out simple instructions was abnormal due to poor concentration and preoccupation; that his ability to get along

17

with the public, supervisors, and co-workers was abnormal because Plaintiff was very suspicious, guarded, and questioned others' motivations; that his ability to deal with changes in the work setting was abnormal because of a history of impaired adaptive skills; that his ability to make simple work-related decisions was abnormal because he was very distracted by details; and that based on a history of "much difficulty adapting," Plaintiff was highly likely to decompensate or become unable to function under stress.  [R397-98].

In the letter dated August 12, 2018, Dr. McLarty wrote that he continued treating Plaintiff for severe depression, bipolar disorder, anxiety, and panic disorder. [R566].  He reported that Plaintiff's symptoms included paranoid thinking; fleeting suicidal ideation; impulse-control instability; mood instability with marked anxiety; questionable judgment; poor concentration, especially in moderating day-to-day activities or tasks; significant hesitancy of thought; and marked difficulty adapting to change.  [R566].  Dr. McLarty additionally indicated that Plaintiff exhibited isolative behavior and became very withdrawn on a regular basis; that there were moments when Plaintiff was unable to perform day-to-day tasks due to anxiety or inability to leave the house; that he had periods of insomnia which caused him to have significant daytime drowsiness; that he was capable of falling asleep very rapidly, even in loud environments; and that he had frequent

18

periods of excessive sleeping during which he had difficulty getting out of bed. [R566].  He stated that Plaintiff's current medical regimen included Lamictal at 300 mg per day; lithium at 600 mg per day; Seroquel at 50 mg per day; gabapentin at 400 mg five times per day; Prilosec at 20 mg per day; Klonopin at 1.5 mg per day; and Xanax at .5 mg as needed.  [R566].  He additionally opined that Plaintiff's symptoms were chronic and impaired him from having sustained, gainful full-time employment in any occupation; that the symptoms, especially poor concentration and mood instability, had been pervasive and interfered with previous work attempts; that Plaintiff would miss upwards of fifteen days per month as a result of his disorder; and that side effects of Plaintiff's medication could cause frequent drowsiness and mental cloudiness that would prevent him from being focused or on-task for a significant portion of the day, "which would make successful work impossible."  [R567].

Given the level of detail contained in the opinions, the Court is hard-pressed to comprehend how they might be discounted as "vague" or conclusory.  [*See* R18]. And while it is true that Dr. McLarty described Plaintiff's functioning as "abnormal" rather than in terms of agency Paragraph B diagnostic levels such as "mild," "moderate," "marked," or "extreme" and thus were "not defined or quantified in terms according to program policy," [*see* R19], a medical source need not use

specific agency language in order to be credited, *Schink*, 935 F.3d at 1261.  If the ALJ found that Dr. McLarty's opinion did not supply sufficient information to enable him to make an informed decision, the ALJ should have further developed the record by ordering a consultative examination rather than simply discounting the opinion.  *See Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11ᵗʰ Cir. 1984) ("It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision."); *Ford v. Sec'y of Health & Human Servs.*, 659 F.2d 66, 69 (5ᵗʰ Cir. Unit B 1981)[17] (finding that a consultative psychiatric examination was necessary to enable the ALJ to make an informed decision where the claimant testified that she had trouble sleeping, crying spells, and nervousness; her physician had prescribed medication for her nervousness; and a report from a social worker stated that the claimant was emotionally unstable and unable to work due to her mental and physical condition).

The fact that Dr. McLarty opined that Plaintiff could not work also was not a reason to discount his medical opinions.  While a physician's ultimate opinion of disability—even that of a treating physician—is not entitled to any special

---

[17]    In *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11ᵗʰ Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

deference, it is still necessary for the ALJ to take the opinion into consideration, and the inclusion of an opinion of disability is certainly not a reason to discount the physician's opinion altogether.  *Kelly v. Comm'r of Soc. Sec.*, 401 Fed. Appx. 403, 407 (11th Cir. Oct. 21, 2010) ("A doctor's opinion on a dispositive issue reserved for the Commissioner, such as whether the claimant is 'disabled' or 'unable to work,' is not considered a medical opinion and is not given any special significance, even if offered by a treating source, *but will be taken into consideration*.") (italics added).

The ALJ's finding that Plaintiff's treatment was "routine in nature," without any emergency-room or inpatient mental-health treatment since the alleged onset date, [R18], also does not supply good cause for rejecting Dr. McLarty's opinions. It is certainly permissible for the ALJ to consider the consistency of a medical opinion with the record as a whole.  20 C.F.R. § 404.1527(c)(4).  The Court finds no basis, however, for the ALJ's assumption that Dr. McLarty's opinions were so extreme as to be invalid absent records showing that Plaintiff had received psychiatric hospitalization or inpatient care since the alleged onset date.  *See Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008) (explaining that the record need not contain evidence showing that a claimant is a "raving maniac who needs to be locked up" in order to establish a disabling mental limitation); *Steficek v. Barnhart*,

462 F. Supp. 2d 415, 420 (W.D.N.Y. 2006) (holding that ALJ erred in finding claimant not disabled because of a lack of hospitalizations for his mental disorders). The finding's implication that a regimen that includes medications of the types and dosages stated in the record is "routine in nature" also strains credulity. [*See, e.g.*, R246, 396, 566 (detailing Plaintiff's regimen, which included heavy doses of psychotropic and narcotic medication)]. Thus, to the extent that the ALJ rejected Dr. McLarty's opinion based on the routine nature of treatment or the lack of records of hospitalization or inpatient mental-health treatment during the relevant period, this was error.

For these reasons, the Court finds that the ALJ reversibly erred by failing to supply good cause for discounting Dr. McLarty's medical opinions.

The Court also agrees with Plaintiff that the ALJ failed to properly evaluate the side effects of Plaintiff's medications. As noted above, the ALJ discounted the credibility of Plaintiff's testimony that his medication made him sleepy based on the ALJ's finding that Plaintiff made no reports of medication side effects during treatment except during a visit to Dr. Gandhi where Plaintiff reported that his pain medications caused sleepiness and requested that Dr. Gandhi document the information for the purposes of remaining unemployed. [R20-22]. Review of the treatment notes reveals, however, that the reports of no side effects appeared in the

22

"history of present illness" section of Dr. Gandhi's treatment notes, a section comprised largely of unchanging boilerplate language, and that the boilerplate text is frequently contradicted by contemporaneous notes indicating that Plaintiff complained of problems with concentration and memory. [*See, e.g.*, R379, 380, 383, 384, 387, 388, 391, 392, 454, 455, 458, 459, 462, 463, 475, 477, 479, 480, 483, 484, 488, 489, 492, 493, 498, 499, 502, 503, 506, 507, 514, 515, 518, 519, 536, 538, 540, 542, 553, 554, 561, 563].   The ALJ additionally failed to acknowledge that Plaintiff's wife reported to the ALJ that Plaintiff's medication made him drowsy and that within a day he would forget things that he had been told, [R248], and that Dr. McLarty's treatment notes, which were handwritten and admittedly difficult to parse, indicate that Plaintiff demonstrated and/or complained of memory and cognition problems related to his use of Oxycontin, [18] [*see, e.g.*, R403, 466, 510].  The Court also notes that the ALJ relied on Plaintiff's trips to Disney World as proof that Plaintiff's ability to sustain concentration was greater than claimed, which both makes little sense logically, since there is scant reason to believe a family trip to Disney World would require much, if any,

---

[18]     Oxycontin (oxycodone) is an opiate analgesic used to relieve moderate to severe pain. MedlinePlus, *Oxycodone*, https://medlineplus.gov/druginfo/meds/a682132.html (last visited 3/1/2021).

concentration, and fails to acknowledge Plaintiff's testimony and Plaintiff's wife's letter describing Plaintiff's extremely limited ability to participate in the visit. [*Compare* R22 *with* R44-45, 248].

A decision cannot be said to be supported by substantial evidence when it relies on cherry-picked statements, *Chester*, 792 F.2d at 131 (requiring that the reviewing court consider the record as a whole, including evidence unfavorable to the Commissioner's decision), or on statements that are untrue, *Flentroy-Tennant v. Astrue*, No. 3:07-cv-101-J-TEM, 2008 WL 876961, at *6, 8 (M.D. Fla. Mar. 27, 2008) (An "ALJ is required to build an accurate and logical bridge from the evidence to his conclusion."); *Baker v. Barnhart*, No. 03 C 2291, 2004 WL 2032316, at *8 (N.D. Ill. Sept. 9, 2004) (same); *see also Duncan v. Colvin*, Civ. Action File No. 1:15-CV-2091-JFK, 2016 WL 1253458, at *14, n.27 (N.D. Ga. Mar. 31, 2016) (highlighting, upon remand, that the ALJ's decision relied on a factual misstatement of the plaintiff's activities of daily living, which gave the court pause in reviewing the ALJ's factual findings for substantial evidence).  Accordingly, the Court concludes that the ALJ did not fully and fairly evaluate the evidence supporting Plaintiff's claims of the limiting side effects of his medication.

The Court also finds that the ALJ's reliance on the opinions of the reviewing physicians is misplaced.  In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. § 404.1527(c)(1)-(6).  As noted above, the only medical expert opinions to which the ALJ assigned great weight were the opinions of the reviewing physicians. [R22].  However, those opinions were issued on February 3, 2017, and May 12, 2017, [R63, 86], and therefore do not reflect review of all of the relevant evidence:  They predate Plaintiff's wife's description of his condition in her letter to the ALJ, [R248]; later medical records indicating that Plaintiff's cognition and memory were affected by his medications and condition, [R477, 480, 484, 489, 493, 510, 514, 515, 519, 538, 542, 554, 563]; Dr. McLarty's August 2018 medical opinion stating the same, [R566-67]; and a corroborating medical opinion issued by Dr. Gandhi on July 26, 2018, wherein Dr. Gandhi stated that most of the medications in Plaintiff's daily regimen would have additive effects with the hydrocodone he prescribed, that the side effects include sedation and mental

cloudiness, and that narcotic medications by themselves were sedating, [R565]. The opinions of the state agency reviewing physicians therefore are outdated and cannot amount to substantial evidence sufficient to support the RFC. 20 C.F.R. § 404.1527(c)(6).

Additionally, while Plaintiff did not raise the issue in his brief, the Court is also troubled by the fact that the ALJ relied upon the opinion of a reviewing physician who gave Dr. McLarty's January 10, 2017, opinion no weight because he found it to be "an exact copy" of an opinion issued on February 6, 2014, [R80], a finding which is not true, [*compare* R272-74 *with* R395-98],[19] and which the ALJ failed to address.  This is yet another reason the reviewer's opinion does not amount to "substantial evidence" in support of the RFC.

For all of the reasons set forth above, the undersigned concludes that the ALJ reversibly erred by failing to provide good cause for discounting Dr. McLarty's opinions, failing to properly consider the side effects of Plaintiff's medications, and relying on the reviewing opinions.

---

[19]     While it is clear that the 2014 opinion served as the starting point for the 2017 opinion, the 2017 opinion details a different medication regimen and includes additional observations.  [*Compare* R272-74 *with* R395-98].

26

## VI.   <u>CONCLUSION</u>

In conclusion, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.

The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this 2d day of March, 2021.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

27